DOCKET NO. 23-13628-D

# United States Court of Appeals
*for the*

# Eleventh Circuit

———————◆———————

DONALD WHIDDEN and MARGARITA WHIDDEN,

*Appellants*,

v.

FEDERAL INSURANCE COMPANY,

*Appellee*.

———————————————————————

ON APPEAL FROM FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO. 8:21-CV-3012-SCB-AAS

## APPELLANTS' INITIAL BRIEF

Timothy W. Weber, Esq.
Jeremy D. Bailie, Esq.
Weber, Crabb & Wein, P.A.
5453 Central Avenue
St. Petersburg, Florida 33710
(727) 828-9919
*Counsel for Appellants*

DOCKET NO. 23-13628-D

Donald and Margarita Whidden v. Federal Insurance Company

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1(a)(2), Appellants hereby file this *Certificate of Interested Persons and Corporate Disclosure Statement* as follows:

1.  Bailie, Jeremy D. – counsel for Appellant (Plaintiff in the underlying action)

2.  Bucklew, Hon. Susan C. – (District Court Judge)

3.  Chang, David Y. – counsel for Appellee (Defendant in the underlying action)

4.  Chubb Group Holdings, Inc.

5.  Chubb INA Holdings, Inc.

6.  Chubb, Ltd.

7.  Corless Barfield Trial Group, LLC, trial counsel for Plaintiff

8.  Corless, Theodore – trial counsel for Appellant (Plaintiff in the underlying action)

9.  Daniel, Veronica N. – counsel for Appellee (Defendant in the underlying action)

10. Farrant, Laura F. – counsel for Appellee (Defendant in the underlying action)

11. Federal Insurance Company – Appellee (Defendant in the underlying action.)

DOCKET NO. 23-13628-D

Donald and Margarita Whidden v. Federal Insurance Company

12.     Lewis Brisbois Bisgaard & Smith, LLP, counsel for Appellee (Defendant in the underlying action)

13.     McCoy, Mac R. – (Magistrate Judge)

14.     Weber, Crabb & Wein, P.A. – counsel for Appellant (Plaintiff in the underlying action)

15.     Weber, Timothy W. – counsel for Appellant (Plaintiff in the underlying action)

16.     Whidden, Donald – Appellant (Plaintiff in the underlying action)

17.     Whidden, Margarita – Appellant (Plaintiff in the underlying action)

I hereby certify that no publicly-traded company or corporation has an interest in the outcome of the appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument as this case presents an issue of Florida state law that is novel and of first impression in any appellate court, state or federal. Florida law mandates certain basic insurance coverage for the protection of its residents, including sinkhole coverage. Where an insured has purchased sinkhole coverage, the policy is governed by Florida Statutes § 627.706. Interpretation of the sinkhole statute requires consideration of the language of the statute, historical amendments to the statute and the reasons for them, and ultimately an understanding of the engineering and geological framework within which they operate. In the case of Florida Statutes § 627.706(2)(k)(1), the Florida Legislature adopted the "variances" (or tolerances) contained in third-party standards, ACI 117-90 and the Florida Building Code, for determining whether "sinkhole activity" was the cause of "structural damage" and therefore constituted "sinkhole loss" covered under the policy. This case raises the proper interpretation of § 627.706(2)(k), AC 117-90, the Florida Building Code, and, ultimately, their application by professional engineers and geologists. Oral argument would substantially benefit the Court's understanding of the detailed regulatory framework and engineering issues involved.

# **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ............................................... ii

TABLE OF CITATIONS ........................................................................... iiv

STATEMENT OF JURISDICTION.............................................................v

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE FACTS AND CASE .................................................2

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ......................................................................................20

    I.   IN THIS FLORIDA SINKHOLE COVERAGE CASE, THE DISTRICT COURT FAILED TO CONSIDER BOTH TOLERANCES INCORPORATED INTO FLORIDA STATUTES SECTION 627.706(2)(K)(1) IN GRANTING SUMMARY JUDGMENT TO FEDERAL. FEDERAL'S FAILURE TO CONSIDER BOTH TOLERANCES VIOLATED FLORIDA'S SINKHOLE TESTING REQUIREMENTS. ..............................................20

    II.  THE DISTRICT COURT ACTED CONTRARY TO LAW IN PRESUMING FEDERAL'S EXPERTS CORRECT ................................22

    III. THE DISTRICT COURT ACTED CONTRARY TO LAW IN DECIDING THE CAUSE OF THE WHIDDENS' LOSS WHERE IT WAS UNDISPUTED THAT FEDERAL COULD NOT EXCLUDE SINKHOLE ACTIVITY AS A CONCURRENT CAUSE OF LOSS, AN ISSUE UPON WHICH IT BORE THE BURDEN OF PROOF .........24

    IV. AT MINIMUM, THE DISTRICT COURT ERRED IN WEIGHING DISPUTED EXPERT TESTIMONY ON SUMMARY JUDGMENT MANDATING REVERSAL ....................................................................26

CONCLUSION .................................................................................28

CERTIFICATE OF COMPLIANCE........................................................29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF CITATIONS

Page(s)

## CASES

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................ 20

*Citizens Prop. Ins. Co. v. Salkey*,
  260 So. 3d 371 (Fla. 2d DCA 2018) ................................ 19

*Herrera v. Tower Hill Preferred Ins. Co.*,
  161 So. 3d 565 (Fla. 2d DCA 2014) ................................ 18

*Mejia v. Citizens Prop. Ins. Corp.*,
  161 So. 3d 576 (Fla. 2d DCA 2014) ................................ 19

*Surrett v. First Liberty Ins. Co.*,
  2011 WL 3879515 (M.D. Fla. 2011) ............................... 18

*Tower Hill Prime Ins. Co. v. Bermudez*,
  2023 WL 8246151 (Fla. 3d DCA 2023) ........................... 21

*Universal Ins. Co. of N. America v. Warfel*,
  82 So. 3d 47 (Fla. 2012) ................................................. 17

## STATUTES

Florida Statutes § 627.706(2)(k)(1) ...................................... 15

Florida Statutes § 627.7073(1)(c) ......................................... 17

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from a final judgment of the United District Court for the Middle District of Florida in a civil action. The district court had jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship. (Doc. 1). The district court's final judgment was entered on July 19, 2023, (Doc. 75), and the Whiddens timely filed a Rule 59(e) motion (coupled with requests for relief under Rules 60(b)(1) and 60(b)(6)) on August 16, 2023, (Doc. 76), and an amended Rule 59(e) motion, (Doc. 82), which was finally disposed of on October 2, 2023. (Doc. 86) The Whiddens timely filed their notice of appeal on October 31, 2023. (Doc. 87) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether Florida Statutes § 627.706(2)(k)(1) adopted the finished floor tolerance of ½" over 10 feet contained in AC 117-90.

II.     Whether Federal's failure to consider, or exclude, a violation of the finished floor tolerance or sinkhole activity mandated summary judgment against it where Federal had the burden of proof on both structural damage and sinkhole activity.

III.    Whether the district court erroneously presumed that Federal's experts were correct and shifted the burden of proof to the Whiddens.

IV.     Whether the district court erroneously determined the cause of the Whiddens' loss to be due to deleterious soils where Federal failed to exclude sinkhole activity as a concurrent cause of loss.

V.      Whether the district court erred in concluding that the Whiddens failed to present sufficient evidence of sinkhole loss occurring during the policy period.

## STATEMENT OF THE FACTS AND CASE

### Basic Facts

Donald Whidden and Margarita Whidden ("the Whiddens") resided at 4807 Culbreath Isles Road, Tampa, Florida and insured their home through Federal Insurance Company ("Federal"). The property consisted of the main house, a detached garage on a separate pad, and a swimming pool. After discovering cracks in their foundation extending across the main house and a newly formed depression in the ground near the house, the Whiddens submitted a claim to Federal seeking benefits under their insurance policy.[1]

Federal did not initially investigate the claim as a potential sinkhole loss. Federal hired an engineering and consulting firm, J.S. Held LLC ("JS Held"), which performed a *Limited Structural Damage and Geotechnical Assessment* and concluded that insufficient compaction of the soils prior to construction, buried construction debris, and the presence of a root ball from a removed palm tree (collectively "deleterious soil conditions") were the cause of raveling of the overburden soils and hence differential settlement of the foundation. (Doc. 35-3).

The Whiddens again raised concerns of *sinkhole loss* upon being notified of J.S. Held LLC's limited investigation. (Doc. 35-4). Under Florida Statutes § 627.706, which is incorporated verbatim into the Federal insurance policy ("*Policy*")

---

[1] *Italicized* terms or expressions represent defined words within the Policy.

covering the home, (Doc. 35-1), coverage for *sinkhole loss* exists when there is *structural damage* caused by *sinkhole activity*. Specifically, the *Policy* provides coverage for *sinkhole loss*, which means *structural damage* to the covered building, including the foundation, caused by *sinkhole activity*. (Doc. 35-1 at 59) Definitionally, there are two questions posed: (1) was there sinkhole activity; and (2) did it cause structural damage? Under Florida law, the insurer bears the burden of proof on both questions. *See Mejia v. Citizens Prop. Ins. Corp.*, 161 So. 3d 576, 578 (Fla. 2d DCA 2014).

In response, Federal advised its insureds that it had "retained a professional engineer and/or professional geologist to conduct testing at the subject property to determine the cause of the loss within a reasonable professional probability." (Doc. 35-4 at 1). However, JS Held did not conduct testing to determine the cause of the loss but instead issued a second report opining that the property had not sustained *structural damage* within the meaning of the sinkhole statute and *Policy* and, therefore, there could be no *sinkhole loss*. (Doc. 35-5) JS Held's second report did not address the presence or absence of sinkhole activity as a cause of the loss. (Doc. 35-5)

The Whiddens, through counsel, formally demanded that Federal conduct a proper *structural damage* evaluation and that it also perform a subsidence investigation to determine the cause of the damage in accordance with Florida

Statutes § 627.7072. (Doc. 35-6). Federal informed the Whiddens: (a) "[t]o determine if the insured's (sic) home has damage from *sinkhole loss*, we first must determine if there is *structural damage* to the building as defined by the statute"; (b) "[o]ur assessment concluded that Structural Damage as defined by Florida Statute § 627.706 did not exist"; and (c) "[t]herefore, because a Sinkhole Loss means Structural Damage to the covered building, including the foundation, caused by Sinkhole Activity, a Sinkhole Loss as defined within F.S. § 627.706 has not occurred." (Doc. 35-8).

Despite denying the claim due to the absence of *structural damage,* and without conducting testing for *sinkhole activity*, Federal advised: "[p]lease be advised that in accordance with Florida Statutes 627.7072, Federal Insurance must advise you at this time that the insureds have the right to demand testing by a professional engineer or a professional geologist. Your demand for testing must be communicated to us, in writing, within 60 days after your receipt of this letter." (Doc. 35-9). Within a few weeks, the Whiddens' counsel reiterated, in writing, the Whiddens' demand for additional geotechnical testing, noting that such a request had already been made in his prior letter. (Doc. 35-10). After some deflection by counsel for Federal, the Whiddens, through counsel, again stated: "My letter from November came after you all claimed there was no structural damage, and included a request to conduct a geotechnical investigation as required by the statutes. That

was three months ago, and no action has been taken for that purpose.  These delays continue to be burdensome on my client, and I'd appreciate moving on the request at your earliest convenience." (Doc. 35-11)

Although Federal acknowledged the statutory requirement to offer testing upon request, and the Whiddens specifically requested it, Federal ultimately refused to conduct the geotechnical subsidence investigation for *sinkhole activity*, choosing instead to stand on its position that there was no *structural damage*.  It explained, "I have reviewed this claim with the engineer who inspected the loss and managers at Chubb [Federal].  We have completed all geotechnical investigation required by the statute and found no *structural damage*. This report has been sent to you along with a coverage denial letter for the reported damage. At this time, it is Chubb's opinion that we have met all requirements of the Florida sinkhole statute." (Doc. 35-11 at 2).

Following Federal's final denial and refusal to perform additional testing, the Whiddens filed the instant lawsuit in state court, which was timely removed to the district court by Federal. (Composite Doc. 1)

*Sinkhole Activity*

In their Amended Complaint, the Whiddens alleged that Federal "has not completed a full geotechnical investigation as contemplated by the *Policy* and Florida Statutes to determine whether sinkhole activity was a cause of any damage to the insureds' home. (Doc. 10, ¶ 17) Federal denied this allegation. (*See* Doc. 14,

¶ 17) In its Rule 26(a)(2) disclosures, Federal listed three experts, Engineer Howard, Geologist Hollingsworth, and Contractor Coughlin ("JS Held's Consultants"). Prior to the filing of this action, JS Held's Consultants wrote, signed, and sealed three reports (collectively referred to as the "JS Held Reports"), which were: (a) "Damage Asssessment Report," signed and sealed September 11, 2020, by Engineer Howard and Geologist Hollingsworth (Docs. 27-10, 35-3); (b) "Supplemental Structural Damage Assessment Report," signed and sealed October 16, 2020 by Engineer Howard and Geologist Hollingsworth (Docs. 27-11, 35-5); and (c) "Water Intrusion Damage Assessment Report," signed and sealed October 22, 2020 by Engineer Howard alone (Doc. 27-12). None of the JS Held Reports addressed the presence or absence of *sinkhole activity*.

The first time *sinkhole activity* appeared in any report of the JS Held Consultants was in the "Structural & Geotechnical Rebuttal Report," signed and sealed January 13, 2023 (Doc. 27-13), during the litigation and almost two years after the claim was denied. The rebuttal expert report did not suggest that JS Held Consultants investigated the presence or absence of *sinkhole activity* at the property. It merely stated, "based upon our review of the SEI and PEC Reports, as well as our own observations, analysis, research, it is our opinion that the conditions at the [Insureds' Home] do not evidence *sinkhole activity*." (Doc. 27-13).

However, when JS Held Consultant, Mr. Howard, was pressed in his deposition about *sinkhole* activity, he stated:

> Counsel:    So I'm going to ask you, sir, as of September of 2021, did you ever advise any representative of Federal or Chubb that there was no sinkhole activity at the Insureds' Home?

> Howard:    No.

> Counsel:    All right.  Now – well let me polish that.  Suffice to say, if [the Insurance Company] got that opinion it wasn't from Mr. Howard?

> Howard:    That's correct.  That was never a part of our [i.e. JS Held's] scope to determine the presence or absence of *sinkhole activity* at the site.

(Doc 27-13, Page 8, Lines 14-24). He was asked the ultimate question: "can you *now* tell me that you are certifying the absence of sinkhole activity?" His answer: "No." (Doc. 27-13, Page 9, Lines 20-21). Mr. Howard further admitted that JS Held Consultants never sought to eliminate *sinkhole activity* as a possible cause of the damage:

> Counsel:    You're familiar with the expression "concurrent cause"?

> Howard:    Yes.

> Counsel:    And if so I understand your answer correctly, you've identified what you believe to be a condition of deleterious or bad soil, we'll call it, in the surficial soils; is that correct?

> Howard:    That's correct.

Counsel:    And – but at the same time you admit you can't eliminate sinkhole activity as a concurrent cause as well; is that an accurate statement?

Howard:    Well, within the limits of our scope and our investigation, that's an accurate statement, yes.  I can't say we can't eliminate it (sic) but weren't asked to and weren't authorized to do that additional testing.

(Doc. 27-13 at 22, Lines 10-25; Page 23, Line 1).  He says, "we considered whether or not the conditions were consistent with or representative of what we would expect to see if there were *sinkhole activity*. But, no, *[JS Held] did not drill to go verify the presence or absence of sinkhole at the site*." (Doc. 27-13, at 20).

The Whiddens produced a report from SEI, a geotechnical engineering firm, which included statutorily-compliant testing and analysis of *sinkhole activity*. The SEI report concluded that *sinkhole activity* was present and contributing to the Whiddens' loss. In Federal's Rebuttal Report, Howard dismissed the report, stating, "conditions such as diminishing N-Values, WOH and LOC events, and disruptions in the soil column can be indicative of, but are not exclusive to, sinkhole formation." (Doc. 27-13 at 12). While Howard did acknowledge evidence of cracks and differential movement of the foundation, (Doc. 27-14 at 11, Lines 2-11), according to him the JS Held Consultants were never asked by Federal to eliminate the presence or absence of sinkhole activity as a cause of the damage. (Doc. 27-14 at 16, Lines 18-24).

Given that the definition of *sinkhole activity* in the Policy requires an examination regarding the "dissolution of limestone, or other similar rock formation," (Doc. 27-2 at 76), Mr. Howard was questioned on JS Held Consultant's analysis of the underground limestone conditions:

> Counsel:    Can you testify now [as of January 17, 2023] within a reasonable degree of scientific certainty the condition of the limestone present at the [Insureds' Home] based upon the JSH investigation?
>
> Howard:    If I understand your question correctly, the answer is no, I can't.

(Doc. 27-14 at 20, Lines 9-14).  Mr. Howard concluded by discussing what he or the other JS Held Consultants would need in order to render an opinion regarding the absence of *sinkhole activity*:

> [w]ell, there'd have to be some deep borings, such as, SPT borings, standard penetration borings to explore the soil conditions with depth near the limestone at multiple locations around the property, perhaps beneath the property, beneath the house.

(Doc. 27-14 at 21, Lines 14-21).  As to whether they could now base opinions upon the data collected by the Whiddens' expert, Mr. Howard stated, "We did not get to that stage in our analysis or our evaluation of the site conditions or the analysis of the information provided by others."  (Doc. 27-14 at 16, Lines 6-10).

In short, Federal never eliminated *sinkhole activity* as a concurrent cause of the damage to the Whiddens' home, particularly because it failed to perform adequate subsidence testing in accordance with Florida Statutes §§ 627.707 and

627.7072, despite specific request by the insureds that they do so on at least two occasions.

*Structural Damage*

Federal stood on its conclusion that, regardless of cause, the home had not suffered *structural damage*. Under the Policy, *structural damage* is defined as a situation where a covered building, *irrespective of its construction date*, experiences interior floor displacement or deflection that exceeds the acceptable variances outlined by ACI 117-90 or the Florida Building Code. This displacement or deflection results in settlement-related damage to the interior, rendering the building structure or its components unfit for service or posing a safety hazard as specified in the Florida Building Code. (Doc. 27-2 at 76) (emphasis added).

Thus, the first step is to determine the "acceptable variances" as set by ACI 117-90 or the Florida Building Code, without considering the construction date.

*Bracken Affidavit*

The Whiddens submitted the Affidavit of William Bracken, which, after detailing his extensive professional background, explained that he was the drafter of Florida Statutes § 627.706(2)(k)(1) through (5), which was signed into law on May 17, 2011 by Governor Rick Scott. (Doc. 76-1 at 2) Mr. Bracken explained that in 2011 when the statute was drafted, neither the American Concrete Institute nor the

Florida Building Code had original construction tolerances or design tolerances (a.k.a "acceptable variances") for cast-in-place concrete slabs on grade. (Doc. 76-1, at 3). Instead, the Florida Building Code incorporated by reference the American Concrete Institute's "Specifications for Tolerances for Concrete Construction and Materials" (ACI 117). (Doc. 76-1 at 4) However, at the time of drafting the statute ACI 117 did not contain any original construction tolerances. (Doc. 76-1 at 4) The last edition of ACI 117 to include original construction tolerances for cast-in-place concrete slabs on grade was the 1990 edition of ACI 117 (ACI 117-90). (Doc. 76-1 at 4). It was for that reason that ACI 117-90 was referenced in the statute. (Doc. 76-1 at 4).

Bracken makes clear, however, that the statute only incorporated the original construction tolerances set forth in ACI 117-90 and was purposefully not cited in whole because ACI 117 only applied to new construction. (Doc. 76-1). Bracken further explained that the method of measuring the tolerances (a 10-foot straightedge) was similarly not incorporated into the statute as, by 2011, engineers were using gas levels and other instruments, such as the ZipLevel® system used by both parties' engineers in this case. (Doc. 76-1)

Bracken further noted that he was the principal author of *Minimum Testing Guidelines for Evaluating Structural Damage in Buildings with Respect to Florida Statute § 627.706*, Florida Association of Sinkhole Stabilization Specialists

("FAS(3)"), SDA-13, October 2013. (Doc. 76-1 at 5) As Bracken noted, these industry guidelines recognized the use of calibrated manometers, calibrated gas levels, or equivalent apparatus for determining the levelness of a horizontal surface in a sinkhole investigation. (Doc. 76-1 at 5). Bracken explained that in determining interior floor displacement or deflection in excess of "acceptable variances", the adopted variances included (1) an overall floor levelness requirement of $\pm$ ¾ inch over the entire surface of the concrete slab on grade (ACI 117-90 Section 4.3.1.1) and (2) a floor finish variance where the gap between the floor and a 10-foot straightedge placed on two high spots was in excess of ½ inch (ACI 117-90 Section 4.5.7). According to Bracken, a proper structural damage analysis under the statute requires consideration of both tolerances. (Doc. 76-1 at 5)

Notably, at the time JS Held Consultants were conducting their *structural damage* analysis on the Whiddens' home, Bracken was the Executive Vice-President for Forensic Architecture and Engineering at J.S. Held LLC. (Doc. 76-1 at 13).

*JS Held Consultant's Investigation of Structural Damage*

Mr. Howard, despite acknowledging the ½ inch tolerance under ACI 117, believed that the standard applied exclusively to newly poured concrete foundations and not sinkhole claims on existing slab construction. (Doc. 27-14 at 28) He pointed to ACI 117, Section 4.5.7, specifying the floor finish tolerance involving a 10-foot straight edge, noting that the measurement should be taken "within 72 hours after

slab concrete placement." (Doc. 27-14 at 28) He made this and other arguments in his deposition as to why this tolerance should not be used, despite the language of the statute "irrespective of its construction date." (Doc. 27-14 at 28-31) Thus, he did not apply this standard in his analysis. (Doc. 27-14 at 32-33) (arguing that localized unlevelness should not be considered in a sinkhole claim). Notably, Mr. Howard argued that *structural damage* could not be found where there was a large slope in the slab going to its edge (such as the .9 inches of deflection over 8 feet in the Whiddens' dining area). Under his analysis, it was only where a 10-foot straight edge could be positioned on two high points and reveal a sink in the middle that the standard would be met. (Doc. 27-14 at 31)[2] Of course, JS Held Consultants never used a 10-foot straight edge anywhere on the property, choosing instead to ignore the standard altogether.

Plaintiff's expert witness, Byron Anderson, a professional engineer and licensed general contractor, opined that JS Held Consultant's investigation was inadequate in that JS Held only considered the overall floor levelness requirement in Section 4.3.1.1 of ACI 117-90 and disregarded the floor finish requirement of Section 4.5.7 requiring analysis of a ½ inch gap between a finished floor and a 10-

---

[2] A 10-foot straightedge cantilevered from one high point to the edge of a slab would not, in his opinion, be a means of showing deflection. Thus, under Mr. Howard's interpretation, only sinkholes occurring in the middle of the slab and not around the edges could be covered.

foot straightedge on two high points. (Doc. 76-2 at 2). His affidavit was consistent with Bracken's affidavit as to the applicability of both requirements. Engineer Anderson pointed out that, from the data collected by both parties' experts, multiple floor elevation surveys show greater than .5 inches of deflection in 10 feet. (Doc. 76-2 at 3).

*Daubert and Summary Judgment Motions*

The Whiddens filed a motion challenging the expert testimony of Mr. Howard on the grounds that he could not opine on the presence or absence of *sinkhole activity* absent the performance of sinkhole testing in accordance with Florida Statute. They also argued that his opinion on *structural damage* should be excluded as he failed to apply both tolerances in ACI 117-90. The Whiddens also sought summary judgment against Federal on the grounds that Federal had the burden of proof on both issues under this all-risk policy and that it could neither eliminate *sinkhole activity* as the cause of the damage nor exclude *structural damage* based upon its incomplete investigation. The Whiddens argued that both parties' experts, using a gas level, noted floor deflections greater than ½ inch over 10 feet.

Federal sought summary judgment, arguing that the Whiddens failed to "meet their burden of showing that the property was damaged by the covered peril of sinkhole loss." (Doc. 35, at 1). Federal argued that the Whiddens had the burden of proof on sinkhole loss under the Policy and that they failed to adduce sufficient

evidence of structural damage or sinkhole activity. (Doc. 35, at 13). Federal also argued that the Whiddens failed to adduce proof of a loss during the Policy period. (Doc. 35, at 13). Federal argued that only the overall levelness requirement of ACI 117-90, 1.5 inches over the entire slab, applied to the Whiddens' home and that the measurements of both parties' experts showed it was met. (Doc. 35 at 17-22). Federal interpreted § 627.706(2)(k)(1) to only include one tolerance, not two. Thus, it asked the district court to ignore the ½ inch gap between the floor and a 10-foot straightedge contained in ACI 117-90, as well as the l/240 formula derived by Plaintiff's expert, Mr. Smith, from the Florida Building Code. Federal argued that none of these standards applied.

*The District Court's Order Granting Summary Judgment*

The district court granted summary judgment to Federal and denied the Whiddens' motion for summary judgment. In its order, the district court concluded that JS Held Consultants conducted sufficient testing to determine the presence or absence of *sinkhole loss* or other cause of damage. (Doc. 71, at 7 fn. 6). It cited that the vertical differential of the measured slab was 1.3 inches, less than the 1.5 inch maximum in ACI 117-90. The district court concluded that the Florida Statutes did not require a subsidence investigation to determine the presence of *sinkhole activity*. (Doc. 71, at 9-10) It specifically cited to Florida Statutes § 627.7073(1)(c) providing that "[t]he respective findings, opinions, and recommendations of the insurer's

15

professional engineer or professional geologist as to the cause of distress to the property . . . *shall be presumed correct." (Doc. 71, at 10).* The district court faulted Plaintiffs for not presuming the correctness of the JS Held Consultants. (Doc. 71, at 10). The district court found that the Whiddens had not come forward with any evidence to rebut the JS Held Consultants' findings that the property did not sustain *structural damage* (and hence no *sinkhole loss*). (Doc. 71 at 14). The district court concluded that the Whiddens' expert, Smith, did not use a 10-foot straight edge to measure gaps in the floor exceeding ½ inch and that the l/240 standard derived from the Florida Building Code was inapplicable. (Doc. 71 at 18). The district court concluded that the Whiddens' expert incorrectly interpreted the statute to require consideration of the ½ inch gap standard of ACI 117-90 or the l/240 formula from the Florida Building Code. (Doc. 71 at 20)

In addition, the district court concluded that JS Held Consultants had determined the actual cause of loss at the Property to be deleterious soils, despite the admissions by Federal's experts that they could not rule out *sinkhole activity* as a concurrent cause of loss because they had performed no testing. (Doc. 71, at 23).

The district court denied both parties' *Daubert* motions. (Doc. 71, at 25 fn 15).

*The Whiddens' Rule 59(e) and 60(b) Motions*

16

The Whiddens timely filed a Rule 59(e) motion, coupled with requests for relief under Rule 60(b)(1) and 60(b)(6). (Doc. 82) The Whiddens pointed out that the district court failed to consider the ½ inch gap under a 10-foot straightedge tolerance in ACI 117-90, or its equivalency of l/240 (10 feet is 120 inches and where l is ½" the denominator would be 240). The Whiddens argued that Florida Statutes § 627.706(2)(k)(1) only adopted the tolerances or variances contained in ACI 117-90 and the Florida Building Code and not the means of measurement. (Doc. 82 at 1). The Whiddens relied upon the Bracken affidavit which unambiguously explained why the ½ inch gap under a 10-foot straightedge standard applied and that it was error for the district court to ignore part of the statutory standard under the first criterion for *structural damage*. (Doc. 82 at 1-6). The Whiddens next argued that it was improper for the district court to fault the Whiddens' expert for using a gas measurement tool (ZipLevel®) instead of a straightedge as the statute did not incorporate the means of measurement, as explained by Bracken. (Doc. 82 at 6-9).

The Whiddens also argued that the district court erred as a matter of law in presuming the correctness of JS Held Consultants, despite two Florida Supreme Court opinions holding that the statutory presumption had no application, *See Johnson v. Omega Ins. Co.*, 200 So.3d 1207, 1214 (Fla. 2016) ("it is clear that the court below acted in conflict with our decision in *Warfel* when it extended the presumption of correctness to the initial insurance company report, which was

17

incorrect, during litigation and placed a burden on Johnson to further rebut it");

*Universal Ins. Co. of N. America v.* Warfel, 82 So. 3d 47, 57 (Fla. 2012) ("Nothing

in section 627.7073, the statute in question here, justifies application of that statute

to the litigation context"), and that the district overlooked Florida's concurrent cause

doctrine which required Federal to rule out sinkhole activity as a contributing cause

of the loss. *See Citizens Property Ins. Corp. v. Salkey*, 260 So.3d 371 (Fla. 2d DCA

2018) (applying Florida's concurrent cause doctrine and placing burden on insurer

to prove that no loss was caused by sinkhole, despite existence of deleterious soils).

The Whiddens argued that the district court improperly weighed the

conflicting expert testimony and erroneously interpreted Florida's sinkhole statutes

in several respects.  The district court denied the motion.

This appeal timely followed.

## SUMMARY OF THE ARGUMENT

Under Florida law, an "all-risk" homeowner's policy insures against all risks

unless unambiguously excluded by the insurer. The insurer bears the burden of proof

on any exclusion from coverage. In the context of sinkhole loss coverage, which is

highly regulated by the Florida Legislature for the protection of insureds, the insurer

bears the burden of establishing that damages to the insured's home did not rise to

the level of structural damage, as defined by the statute, and that such damages were

not caused, even in part, by sinkhole activity.

Federal did not conduct testing sufficient to eliminate sinkhole activity as a concurrent cause of the Whiddens' loss. On the issue of whether the damage to the Whiddens' home was structural damage, Federal failed to evaluate the property using both tolerances or variances contained in ACI 117-90, the standard adopted by Florida Statutes § 627.706(2)(k)(1). Federal's expert simply disagreed with using one of the "acceptable variances" incorporated into the statute. Since Federal failed to evaluate structural damage using the correct statutory criteria, Federal could not meet its burden of excluding coverage based on the absence of structural damage.

The district court's order granting summary judgment to Federal was based on multiple mistakes concerning Florida's sinkhole statutes and law. First, the district court presumed that Federal's experts were correct, citing Florida Statutes § 627.7073(1)(c). The Florida Supreme Court has twice held that courts err when they apply the presumption contained in § 627.7073 in the context of sinkhole litigation. Second, the district court erred in determining the cause of the Whiddens' loss when it was undisputed that Federal failed to exclude sinkhole activity as a concurrent cause of loss. Federal's experts admitted they had not performed standard penetration boring or other sufficient measures to eliminate sinkhole activity as a concurrent cause of loss. Absent elimination of a covered loss as a concurring cause, the district court could not, as a matter of law, conclude that the Whiddens' losses were from uncovered causes. Third, the district court adopted Federal's position by

itself ignoring the second tolerance in ACI 117-90. As a result, it concluded that no structural damage was present based solely on the first tolerance. Such a conclusion is erroneous as a matter of law where the statute contained two tolerances. Fourth, the district court shifted the burden of proof to the Whiddens and ignored Federal's failure to meet its burden.

Correct application of Florida's sinkhole statutes, burden of proof, and concurrent cause doctrine mandated summary judgment in favor of the Whiddens on coverage. At the very least, the battle of the parties' experts presented a question of fact for jury resolution regarding when the loss occurred, the cause of the loss, and whether it constituted structural damage. It was error for the district court, in combination with its application of an erroneous presumption and shifting of the burden of proof, to resolve all disputed facts and inferences in favor of Federal in granting it summary judgment.

This Court should reverse.

## **ARGUMENT**

I.    IN THIS FLORIDA SINKHOLE COVERAGE CASE, THE DISTRICT COURT FAILED TO CONSIDER BOTH TOLERANCES INCORPORATED INTO FLORIDA STATUTES SECTION 627.706(2)(K)(1) IN GRANTING SUMMARY JUDGMENT TO FEDERAL. FEDERAL'S FAILURE TO CONSIDER BOTH TOLERANCES VIOLATED FLORIDA'S SINKHOLE TESTING REQUIREMENTS.

The JS Held Consultants only considered the overall floor levelness tolerance of 1.5 inches (± ¾ inch over the entire slab) contained in ACI 117-90. Adopting its opinions and investigation, the district court only considered the overall floor levelness tolerance of 1.5 inches contained in ACI 117-90. The district court dismissed the second tolerance in ACI 117-90 by noting that the Whiddens' engineer "did not measure with a 10-foot straight edge." (Doc. 71, at 17). Of course, the district court conveniently overlooked that Federal "did not measure with a 10-foot straight edge" either. Despite Federal having the burden of proof to show the absence of structural damage, and despite Federal wholly failing to address the second tolerance in ACI 117-90, the district court found that JS Held Consultants had conducted a complete investigation and appropriately determined the absence of structural damage. This was error.

The district court compounded its error by ignoring data suggesting the presence of floor deflection in excess of ½ inch over 10 feet in multiple areas, including the dining room and front entry, as documented in the data of both parties' experts. This data, which was unrebutted, establishes that structural damage within the meaning of Florida Statutes § 627.706(2)(k)(1) was present. JS Held Consultant's opinions, which did not consider the second tolerance, failed to rebut the undisputed evidence of floor deflection in important areas, such as the entry and

dining room, that would constitute, in the opinions of the Whiddens' engineers, a safety hazard.

The district court correctly quoted ACI 117-90 in its opinion but failed to consider the second tolerance. Instead, the district court seized on to a red herring, Mr. Smith's use of the formula l/240 from the Florida Building Code and its purported application only to elevated flooring systems. Despite Smith's opinion that ½ inch over 10 feet was the equivalency of l/240 (which it is), the fact remains that the floor was deflected in excess of the acceptable tolerance contained in ACI 117-90 that Federal chose to ignore.

The purpose of the Legislature's adoption of sinkhole testing standards and minimum deflection limits was to codify the requirements of sinkhole coverage in Florida.  Where, as here, the finished floor of a slab on grade was deflected in excess of adopted tolerances, it was simply error for the district court to conclude that the Whiddens' home had not suffered structural damage and hence covered sinkhole loss.  It was not the prerogative of Engineer Howard to disagree with the standard adopted by the Legislature.

This Court should reverse.

## II.    THE DISTRICT COURT ACTED CONTRARY TO LAW IN PRESUMING FEDERAL'S EXPERTS CORRECT

The district court erroneously applied a presumption of correctness to the findings, opinions, and recommendations of the JS Held Consultants based on

Florida Statutes § 627.7073(1)(c) and faulted the Whiddens for failing to presume the correctness of Federal's investigation, despite evidence that JS Held Consultants failed to apply both standards for structural damage and never performed testing sufficient to eliminate sinkhole activity as a contributing cause of loss. Florida Statutes § 627.7073(1)(c) provides:

> The respective findings, opinions, and recommendations of the insurer's professional engineer or professional geologist as to the cause of distress to the property and the findings, opinions, and recommendations of the insurer's professional engineer as to land and building stabilization and foundation repair set forth by s. 627.7072 shall be presumed correct.

§ 627.7073(1)(c), Fla. Stat.

In *Universal Ins. Co. of N. America v. Warfel*, 82 So. 3d 47, 57 (Fla. 2012), the Florida Supreme Court held that the presumption in the statute had no application in sinkhole coverage litigation, stating "[n]othing in section 627.7073, the statute in question here, justifies application of that statute to the litigation context." After Florida's Fifth Circuit Court of Appeal once again applied the presumption in litigation to deny attorneys' fees to a prevailing insured, the Florida Supreme Court exercised its conflict jurisdiction and reversed, noting that "it is clear that the court below acted in conflict with our decision in *Warfel* when it extended the presumption of correctness to the initial insurance company report, which was incorrect, during litigation and placed a burden on Johnson to further rebut it." Florida courts have commented that application of the presumption was both "misguided and

23

inappropriate" and that "'the section 627.707(c) presumption in favor of the insurer's engineer's report neither alters the fact of sinkhole damage nor forecloses litigation that attempts to discover the fact of sinkhole damage.'" (quoting *Herrera v. Tower Hill Preferred Ins. Co.*, 161 So. 3d 565 (Fla. 2d DCA 2014) (citing Surrett v. First Liberty Ins. Co., 2011 WL 3879515 (M.D. Fla. 2011) (Merryday, J.))).

The district court's opinion emphasized the statutory presumption in favor of JS Held Consultant's findings and conclusions and faulted the Whiddens for failing to presume they were correct. The Whiddens case started out on an uneven playing field, causing the district court to discount all of their experts and arguments when, in fact, it should have been construing the evidence in the light most favorable to the Whiddens. The district court clearly erred in recognizing a presumption and placing any burden on the Whiddens to rebut it. This allowed the district court to ignore Federal's burden of proof and shortcomings in its analysis and evidence.

III.    THE DISTRICT COURT ACTED CONTRARY TO LAW IN DECIDING THE CAUSE OF THE WHIDDENS' LOSS WHERE IT WAS UNDISPUTED THAT FEDERAL COULD NOT EXCLUDE SINKHOLE ACTIVITY AS A CONCURRENT CAUSE OF LOSS, AN ISSUE UPON WHICH IT BORE THE BURDEN OF PROOF

Under Florida law, Federal had the burden of proof to demonstrate that the Whiddens' loss was uncovered. *Mejia v. Citizens Prop. Ins. Corp.*, 161 So. 3d 576, 578 (Fla. 2d DCA 2014). Specifically, Federal had the burden of proof to demonstrate that the damage to the Whiddens' home was not caused, even in part,

by sinkhole activity. *Citizens Prop. Ins. Co. v. Salkey*, 260 So. 3d 371 (Fla. 2d DCA 2018). Where, as here, Federal's engineers failed to perform standard penetration borings to investigate the soil conditions near the limestone, Federal simply could not eliminate or exclude sinkhole activity as a concurrent cause of loss.  As JS Held Consultant, Howard, testified:

> Counsel:    Can you testify now [as of January 17, 2023] within a reasonable degree of scientific certainty the condition of the limestone present at the [Insureds' Home] based upon the JSH investigation?
>
> Howard:    If I understand your question correctly, the answer is no, I can't.

(Exhibit M, Howard Deposition, Page 20, Lines 9-14).  Engineer Howard identified what he or the other JS Held Consultants would need in order to render an opinion regarding the absence of *sinkhole activity*:

> [w]ell, there'd have to be some deep borings, such as, SPT borings, standard penetration borings to explore the soil conditions with depth near the limestone at multiple locations around the property, perhaps beneath the property, beneath the house.

(Exhibit M, Howard Deposition, Page 21, Lines 14-21).  As to whether JS Held Consultants had an opinion based upon the data collected by the Whiddens' experts, Howard testified, "[w]e did not get to that stage in our analysis or our evaluation of the site conditions or the analysis of the information provided by others."  (Exhibit M, Howard Deposition, Page 16, Lines 6-10). Howard explained, "That was never

25

a part of our [i.e. JS Held's] scope to determine the presence or absence of *sinkhole activity* at the site."

In short, Federal and its experts excluded investigation of sinkhole activity from the insurer's investigation. Both before suit was filed, and at the summary judgment, Federal relied solely on its conclusion of no structural damage and possessed no evidence or ability to eliminate sinkhole activity as a concurrent cause of the Whiddens' loss.

Thus, it was error for the district court to conclude that the actual cause of loss was determined by JS Held Consultants. To the contrary, Federal's failure to exclude sinkhole activity as a concurrent cause of the damage, an issue on which Federal bore the burden of proof, mandates a determination that the cause of the loss was a covered cause, provided that structural damage was present. Summary judgment should have been granted to the Whiddens on the issue of the cause of the loss. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

IV.    AT MINIMUM, THE DISTRICT COURT ERRED IN WEIGHING DISPUTED EXPERT TESTIMONY ON SUMMARY JUDGMENT MANDATING REVERSAL

At the very least, the district court erred in weighing the expert testimony presented by the parties concerning direct physical damage, the cause of loss, and the existence of structural damage. The Whiddens' experts clearly opined that sinkhole activity was present and that the home had suffered structural damage. The district court's erroneous application of the statutory presumption, failure to consider both tolerances in ACI 117-90, erroneous determination of the cause of loss, and erroneous discounting of the opinions of Byron Anderson, P.E., caused the district court to grant summary judgment despite legally sufficient evidence and inferences that there was coverage under the Whiddens' all-risk homeowner's insurance Policy. *See Tower Hill Prime Ins. Co. v. Bermudez*, 2023 WL 8246151 (Fla. 3d DCA 2023) ("battle of the experts" concerning the cause of loss presented a question of fact for the jury).

Similarly, the district court's conclusion that the Whiddens could not even prove direct physical damage to their home during the Policy period was an improper weighing of evidence as Maggie Whidden clearly articulated how the severe cracking was first discovered during the Policy period along with a depression in the ground outside the home that had not previously been there. (Doc. 35-14 53-54) She stated, "it was just all of a sudden, all these things that I thought were just items that needed to be fixed were called to my attention." (Doc. 35-14 at 57-58) In addition, Federal's inspector had been at the home before renewing the Policy, (Doc. 35-14 at

63-64); obviously the inspector did not notice a 16-foot crack in the floor before the Policy began. A reasonable jury could conclude that the Whiddens presented evidence sufficient to support a finding that their home suffered damage during the Policy period.

Accordingly, because there were, at the very least, disputed questions of fact on the issue of coverage, this Court should reverse the summary judgment and remand for a trial on the merits.

## **CONCLUSION**

For the foregoing reasons, the Whiddens ask this Court to reverse the final judgment, enter judgment in their favor, or, alternatively, reverse for a trial on the merits. The Whiddens request such other and further relief as the Court deems proper.

## <u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY that:

1.      This document complies with the type-volume limitation of FRAP 32(a)(7) because, excluding the parts of the brief exempted by FRAP 32(f), this brief contains 6,278 words.

2.      This document complies with the typeface requirements of FRAP 32(A)(5) and the type-style requirements of FRAP 32(a)(6), in that it was prepared using a Times New Roman 14 font.

  *s/ Timothy W. Weber*
Timothy W. Weber, Esq.
FBN:  86789

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the *CM/ECF Portal* and served via *CM/ECF Portal* Electronic Mail to: **Laura F. Farrant, Esquire, laura.farrant@lewisbrisbois.com, David Y. Chang, Esquire**, **David.chang@lewisbrisbois.com**, LEWIS BRISBOIS BISGAARD & SMITH, LLP 110 SE 6th Street, Suite 2600, Fort Lauderdale, Florida 33301, on this **10th day of January, 2023.**

        **WEBER, CRABB & WEIN, P.A.**

        */s/ Timothy W. Weber*
        Timothy W. Weber, Esq.
        FBN: 86789
        Jeremy D. Bailie, Esq.
        FBN: 118558
        timothy.weber@webercrabb.com
        lisa.willis@webercrabb.com
        jeremy.bailie@webercrabb.com
        carol.sweeney@webercrabb.com
        Weber, Crabb & Wein, P.A.
        5453 Central Avenue
        St. Petersburg, FL  33710
        (t): 727-828-9919
        (f): 727-828-9924
        Attorneys for Appellants